IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2021

**JABARI REYNOLDS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 113710      Steven Wayne Sword, Judge**

———————————————————

**No. E2020-01599-CCA-R3-PC**

———————————————————

Jabari Reynolds, Petitioner, was convicted of one count of first degree premeditated murder and was sentenced to life imprisonment. This court affirmed his conviction on direct appeal. *State v. Jabari Reynolds*, No. E2015-00499-CCA-R3-CD, 2017 WL 936521 (Tenn. Crim. App. Mar. 9, 2017), *perm. app. denied* (Tenn. Aug. 16, 2017). Petitioner filed a post-conviction petition alleging that trial counsel was ineffective for failing to focus solely on a theory of voluntary manslaughter. The post-conviction court denied his petition, and Petitioner now appeals. Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Liddell Kirk, Knoxville, Tennessee, for appellant, Jabari Reynolds.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

### Direct Appeal

We summarize the facts from the opinion in the direct appeal as follows:

Petitioner was convicted for the shooting death of the victim, Desean Lowe, following an allegation by Petitioner's girlfriend, Briasha Williams, that the victim had raped her. *Jabari Reynolds*, 2017 WL 936521, at *1.

Waynisha Hamilton lived with the victim in a one-bedroom apartment at the Arbor Place Apartments. After meeting Petitioner in March 2013, Ms. Hamilton allowed Petitioner to stay in her living room in early July. Ms. Hamilton and the victim slept in the bedroom. On the afternoon of July 3, Ms. Hamilton, the victim, and Petitioner were in the living room smoking marijuana when Petitioner received a call from Ms. Williams. Ms. Hamilton could hear both sides of the conversation. Ms. Williams told Petitioner that the victim had raped her. While Petitioner was still conversing with Ms. Williams, the victim told Petitioner that he had not raped Ms. Williams. *Id*.

The victim went to the bedroom. A short time later, Petitioner followed Ms. Hamilton to her bedroom, pulled out a gun, and began firing at the victim. The first shot hit the window, but the next shots hit the victim. Ms. Hamilton ran into the bathroom and locked the door. When she was certain that Petitioner was gone, she went back into the bedroom. She saw the victim lying on his stomach on the side of her bed. Ms. Hamilton said that she ran to a neighbor's apartment and asked for help and then returned to her apartment and called 911. *Id*.

On cross-examination, Ms. Hamilton said that she also overheard Petitioner's telephone conversation with Donna Locklin, Ms. Williams's mother, in which Ms. Locklin told Petitioner that Ms. Williams had said previously that she had been raped by someone named "Sean." Ms. Hamilton said that the victim and Petitioner did not fight prior to the shooting. *Id*. at *2.

Knoxville Police Officer ("KPD") James Lockmiller testified that on the night of July 3, 2013, he and Sergeant Jonathan Chadwell were working as security officers at Arbor Place Apartments and responded to a report of shots fired. Inside the apartment, he discovered a deceased male lying face down on the floor of the back bedroom. *Id*.

2

KPD Investigator Colin McLeod responded to the scene and learned from Ms. Hamilton that the shooter's name was Jabari and that his girlfriend was Ms. Williams. Ms. Hamilton was transported to the police department where she identified Petitioner from a photographic lineup. A BOLO ("be on the lookout") was issued for Petitioner, stating that he was wearing a black or dark hoodie and black pants or long shorts. Petitioner was apprehended in the stairwell at The Vistas Apartments, and a .357 revolver was recovered from his pocket. Petitioner was transported to police headquarters where he was questioned by Investigator McLeod. *Id*. at *4.

After Investigator McLeod advised Petitioner of his *Miranda* rights, Petitioner agreed to talk if he could have a cigarette. Investigator McLeod took Petitioner to the sally port to smoke and conducted a recorded interview there. A recording of the interview was played for the jury. *Id*.

In the recording, Petitioner told Investigator McLeod that, before the shooting, he had a "three-way" call with Ms. Williams and her mother. He said his cellular telephone was "on speaker" and that the victim and Ms. Hamilton could hear the conversation. Ms. Williams accused the victim of sexually assaulting her several months earlier. Petitioner said that he and the victim began fighting on the couch in the living room and that the victim produced a gun. Petitioner knocked the gun from the victim's hands and shot at him. Petitioner said that the victim then went to the bedroom to get a gun and that Petitioner fought the victim, took the gun, and shot at the victim in the bedroom. *Id*. at *5.

Teri Arney, a special agent forensic scientist with the Tennessee Bureau of Investigation's crime laboratory, testified as an expert in firearms examinations. Agent Arney found one unfired .38 caliber hollow-point bullet and five fired cartridge casings were in the revolver. Agent Arney tested all five cartridge casings and one bullet and two bullet fragments that were retrieved from the victim's body during the autopsy and determined that all of the casings and bullets had been fired from Petitioner's .357 revolver. Agent Arney examined the clothing that was removed from the victim's body prior to the autopsy and found four holes in the back of the shirt but no holes in the front. *Id*. at *4.

Lieutenant Steven Patrick with the Knox County Sheriff's Office testified that he was responsible for "the records for the jail phone calls." Lieutenant Patrick said that each inmate was given a unique identification number that had to be entered when the inmate made a telephone call. *Id*. at *5.

Four calls made by Petitioner from jail were played for the jury. In the second call, Petitioner spoke with a woman, later identified as Ms. Williams. Ms. Williams said that Petitioner should have asserted an insanity defense because he was "crazy." Petitioner

laughed and said, "I'm not a girl but I should have killed that b[**]ch, man, I should have killed that old man, f[**]k that s[**]t." Ms. Williams responded, "That's how I know you crazy. . . . You saying all that on the phone." Petitioner responded, "They already got me. . . . What else can they do to me? . . . [T]hey going to throw me in jail?" *Id*. at *6.

During the third call, Petitioner told Ms. Williams that the revelation that the victim was the rapist was "unexpected." Petitioner said that "Chief Keef" began playing in his head and that he went up to "that motherf[**]ker and hit his ass with it." Ms. Williams asked if Petitioner hit the victim with the gun, and Petitioner explained that "he shot the victim but did not hit him." Petitioner said that he shot the victim four times and that the shots hit the victim in his face, in the back of his head, and in his back. *Id*.

In the fourth call, Petitioner said that Ms. Hamilton knew he had the gun in the apartment "the whole time." He said that he told Ms. Hamilton, who was sitting on the couch, to move, and he "grabbed the gun under" her. Petitioner said that he confessed because the police had "the gun and the body." *Id*.

Dr. Steven Cogswell, the deputy chief medical examiner in Knoxville in July 2013, performed an autopsy on the victim's body. Dr. Cogswell said he found no "defensive injuries," such as bruises, cuts, or scrapes to his forearms or hands, to indicate that the victim had engaged in a fist fight. He found a gunshot wound to the victim's upper lip and opined that the victim was "in the upright position" when he received the gunshot wound to the face. Dr. Cogswell found three entrance gunshot wounds and one exit wound in the victim's back, including one gunshot that entered the back of the victim's head. Because of the absence of soot or stippling, Dr. Cogswell opined that the distance from where the shots were fired to the victim was greater than three feet. One of the bullets struck the victim's liver and heart, and another went into his brain. Because of the amount of blood in the abdomen, Dr. Cogswell believed the gunshot wound to the head was the last to occur. *Id*. at *7.

Petitioner testified that, in July 2013, he was nineteen years old and that he had grown up in Chattanooga. After moving to Knoxville, he stayed at Ms. Locklin's house for a few of days but left because the house was too crowded. He asked Ms. Hamilton if he could stay with her, and she agreed. On the afternoon of July 3, Petitioner received a call on his cellular telephone from Ms. Williams who asked if Ms. Hamilton "was around a guy named Sean." Because the volume on Petitioner's telephone was "turned all the way up," the victim heard the question and responded, "That's me." Ms. Williams said, "Baby, he raped me. . . . Sean raped me, baby." Ms. Hamilton and the victim said Ms. Williams was lying. *Id*. at *8-*9.

4

Ms. Hamilton and the victim then left the apartment for a short time. When they returned, the victim went into the bedroom. Petitioner said that he "was high," had "a lot of emotions running through" him, and was confused. When the victim came back into the living room, Petitioner called Ms. Locklin who confirmed that the rapist was someone named "Sean." Petitioner said that the victim asked, "You want some bull[***]t," and then walked into the bedroom. Petitioner said that the victim was "rude" and was "being an [***]hole." Petitioner said that, at that time, "it was just so much confusion and upset, and emotions is running through me. I can't really explain it. It was just—it felt—I just felt like I was being tore, pulled different ways." *Id*. at *9.

Petitioner said that he was "upset" with the victim. Ms. Hamilton told Petitioner to leave, and she walked into the bedroom. Petitioner said that his toothbrush and toothpaste were in the bathroom and that he thought Ms. Hamilton was "fixing to get my stuff." *Id*. at *10.

Rather than leaving, Petitioner retrieved the gun from under the couch cushion and walked just past the doorway into the bedroom. The victim was standing near the closet by the window, and Petitioner began shooting, firing four or five shots. Petitioner said that one bullet hit the victim's cheek. He said the other bullets hit the victim in the back and that he fell. Ms. Hamilton locked herself in the bathroom and Petitioner left. He said that he ran to a nearby apartment building. He was sitting in the stairwell when Officer Heitz found him. Petitioner said that he was talking to his mother on his phone and acknowledged telling his mother, "I've got to go. They got me." His .357 revolver was in his pocket when he was arrested. *Id*.

Petitioner conceded that he told Investigator McLeod that he was not involved in the shooting, but later told Investigator McLeod that he took the gun from the victim. He testified that he and the victim did not fight. Petitioner acknowledged that he shot the victim in the face, in his back, and in the back of his head. He also acknowledged that the victim was unarmed and that he had lied to police. Petitioner claimed that he did not intend to kill the victim but that he was upset and shot the victim because "[h]e raped my girl." *Id*.

Based upon the foregoing, the jury found [Petitioner] guilty of the first degree premeditated murder of the victim, and he was sentenced to life imprisonment. *Id.* at *11.

<u>Post-Conviction Petition and Order</u>

Petitioner filed a timely pro se post-conviction petition and a subsequent amended petition through counsel, arguing in part that trial counsel was ineffective for failing to

"focus[] the defense argument entirely on the victim's provocative response to [P]etitioner's inquiry" whether the victim raped Petitioner's girlfriend. He argued that trial counsel "would have been aware that the defense would not, in this case, have any basis in evidence to credibly contest the facts that [P]etitioner shot the victim, that the victim was unarmed, and that [P]etitioner shot the victim in the back[.]" Thus, Petitioner contended, the only defense strategy available was to argue that there was "adequate provocation" to support a verdict of voluntary manslaughter.

In a written order, the post-conviction court stated that the parties agreed to submit "the technical record" as the body of proof in lieu of a post-conviction hearing. The post-conviction court found that Ms. Hamilton testified that, on the day of the shooting, Petitioner confronted the victim with the rape allegation and the victim denied it. Ms. Hamilton then told Petitioner to leave the house, and instead, Petitioner followed the victim into the bedroom and shot him. Ms. Hamilton "did not describe any other aggressive acts or words by the victim." The post-conviction court stated that trial counsel "focused on the phone call which occurred before the shooting where [P]etitioner was told that the victim raped his girlfriend." The court concluded that "[t]his was a reasonable line of questioning supporting the defense strategy." Trial counsel also asked Ms. Hamilton if there was a physical or verbal confrontation between Petitioner and the victim, and Ms. Hamilton denied that either occurred. Trial counsel "attacked [ ] Ms. Hamilton's credibility in terms of her close relationship with the victim and animosity toward [P]etitioner." The post-conviction court found that trial counsel questioned detectives about Petitioner's statement to police regarding an altercation between Petitioner and the victim and that trial counsel established during cross-examination that "Petitioner had been told about the alleged rape of his girlfriend by the victim."

The post-conviction court noted that, at trial, Petitioner testified that he did not believe Ms. Williams when she first told him she had been raped. Petitioner also testified that he told police he had an altercation with the victim but then testified that "there was no fight." Petitioner stated at trial that "he lied to police that the victim had a gun" and said that the victim was "rude" and "was being an [***]hole." The post-conviction court noted that Petitioner testified at trial that,

> in response, he was "upset" and felt "just so much confusion and upset, and emotions . . . . I just felt like I was being tore [sic], pulled different ways." When asked what was going through his mind when he shot the victim, [P]etitioner stated, "I can't tell you. . . . Just upset, that he raped my girl." At no point did [P]etitioner testify that the victim provoked him in any way.

6

The post-conviction court concluded that Petitioner presented no proof "that could possibly support a voluntary manslaughter argument." The post-conviction court also concluded that, even if there was a "stronger" defense available, Petitioner has not established that trial counsel's defense strategy prejudiced him. The post-conviction court stated that

> Petitioner gave testimony on both direct examination by trial counsel . . . and cross[-]examination by the [S]tate . . . about the events relating to his learning of his girlfriend's allegations against the victim; the victim's response when questioned about the allegations; and the immediate actions taken by [P]etitioner. Thus, the jury was able to hear the evidence related to Petitioner's preferred defense strategy and weigh it accordingly. That trial counsel did not make this the crux of the defense strategy does not suffice to undermine confidence in the outcome.

The post-conviction court denied the petition, and Petitioner now timely appeals.

## Analysis

Petitioner argues that, because the evidence did not support the theories of self-defense, insanity, inability to premeditate, accident, or mistaken identity, trial counsel was deficient for failing to focus solely on the theory of voluntary manslaughter. The State responds that Petitioner has not established prejudice because the evidence did not support a voluntary manslaughter conviction and overwhelmingly supported his conviction for first degree premeditated murder.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the

law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

8

Here, there is nothing in the record on post-conviction or in the direct appeal to explain what defense theory trial counsel argued.[1] Petitioner waived his right to a post-conviction hearing and submitted his petition on the record, so trial counsel did not testify at a post-conviction hearing as to his trial strategy. Moreover, the transcripts from trial did not include the opening or closing arguments, and the jury was not instructed on self-defense. Thus, Petitioner has not established deficient performance for failing to solely argue voluntary manslaughter because he has not established what trial counsel argued at all.

Moreover, both Petitioner and Ms. Hamilton testified that, prior to the shooting, there was no altercation between Petitioner and the victim and that the victim did not have a weapon. Ms. Hamilton testified that Petitioner simply followed her to the bedroom and began firing at the victim. Evidence was presented that Petitioner knew of the allegations that the victim raped his girlfriend, and the jury was instructed on voluntary manslaughter. Thus, the jury had the option to consider voluntary manslaughter based on the alleged rape of Petitioner's girlfriend. The jury found sufficient evidence to convict Petitioner for first degree premeditated murder, and the evidence overwhelmingly supported Petitioner's conviction. As post-conviction counsel stated in his brief on appeal:

> In the present case, the trial evidence was undisputed that [Petitioner] shot and killed the victim, who was unarmed. It would be undisputed that [Petitioner] specifically retrieved his .357 revolver, from under a couch cushion where it had been placed, and walked to a different room inside the apartment carrying that loaded revolver. There he saw the unarmed victim, who was standing inside [the victim's] bedroom near a window. . . . [Petitioner], who had been asked by Ms. Ms. Hamilton to leave the apartment, and could have easily left the apartment, decided instead to go to the bedroom and shoot the unarmed victim four or five times. Shot him straight in his face. Then shot him more in his head and back. Then

_____

[1] The only reference to a defense strategy that this court could glean was from the direct appeal opinion:

> [Petitioner] does not dispute that he shot the victim. He contends, however, that he did not possess the requisite intent to commit first degree murder, asserting that he was under the influence of marijuana. He maintains that Hamilton testified about his "non-responsive nature . . . after he heard that his girlfriend had been raped" by the victim, which he argues supports his theory that he was under the influence at the time of the shooting.

*Jabari Reynolds*, 2017 WL 936521, at *18. It is unclear from the record if trial counsel argued intoxication at trial, or if it was raised only on direct appeal as a sufficiency argument.

[Petitioner] left the apartment and was arrested that same evening. And, knowing that he had been identified as the shooter and had the murder weapon recovered from his actual possession, he decided to try to protect himself from what he understood would be criminal consequences for his conduct, by crafting a false story to tell Investigator McLeod.

. . . .

[Petitioner] did it. He had motive to do it. He knew what he was doing and he knew why. It was not an accidental shooting. He shot the victim right in his face and then shot him some more in his head and back. Emptying all but one round from [Petitioner]'s own revolver. He took that murder weapon with him when he left. He had it when he got arrested. And then he intentionally lied to investigators in order to mitigate what he knew could be serious legal consequences. He made up a story which he thought might create a legal defense for himself, that very evening.

*See Jabari Reynolds*, 2017 WL 936521, at *1-11. Petitioner has presented no evidence that trial counsel's placing a stronger emphasis on a voluntary manslaughter theory would have changed the outcome of the trial; thus, he has not established any prejudice. *See Michael F. Maraschiello v. State*, No. M2019-01287-CCA-R3-PC, 2020 WL 7090200, at *14 (Tenn. Crim. App. Dec. 4, 2020) (finding no prejudice because the "proof at trial overwhelmingly established premeditation, so it would have been both irrational and unreasonable for trial counsel to pursue a theory that the murder was voluntary manslaughter"), *perm. app. denied* (Tenn. Apr. 7, 2021); *Goad*, 938 S.W.2d at 370. Petitioner is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

10